AMERICAN ICE COMPANY *vs.* SOUTH GARDINER LUMBER COMPANY.

Kennebec.    Opinion February, 1911.

*Negligence.   Fires.   Evidence.   Ordinary Care.   Burden of Proof.*

The mere fact that a plaintiff's loss by fire was caused by a spark or cinder from a defendant's smoke-stack is insufficient to establish the defendant's liability.

The owner of a manufacturing plant is not an insurer against communication of fire therefrom, his duty being to use ordinary care in constructing and operating the plant.

"Ordinary care" is such care as an ordinarily prudent man, mindful of himself and of the rights of others, would exercise under the same circumstances.

One suing for loss by fire communicated from another's smoke-stack has the burden of showing negligence in maintaining the stack under all the existing circumstances.

Evidence in an action for loss by fire communicated from a defendant's smoke-stack held insufficient to show that the defendant was negligent.

On motion and exceptions by defendant.    Motion sustained. Verdict set aside.

Action on the case to recover damages for the loss of the plaintiff's ice-houses and other property by a fire alleged to have been caused by the defendant's negligence.    Plea, the general issue. Verdict for plaintiff for $7000.    Defendant filed a general motion for a new trial also took exceptions to several rulings.    Exceptions not considered.

The case is stated in the opinion.

*Charles F. Johnson,* and *W. C. Atkins,* for plaintiff.

*Heath & Andrews,* and *George W. Hesselton,* for defendant.

SITTING : EMERY, C. J., SAVAGE, PEABODY, SPEAR, CORNISH, KING, JJ.

KING, J.    Action on the case to recover damages for the destruction of property by fire alleged to have been caused by the defend-

ant's negligence.    Verdict for $7000.    The case is before this court
on motion and exceptions by defendant.

MOTION.    The plaintiff was the owner of an ice plant situated at
South Gardiner, Maine, on the west side of the Kennebec River.
The defendant owned a lumber mill and plant immediately adjoining
the plaintiff's plant on the south, and in the operation of its mill
maintained and used steam boilers and a smoke-stack for the escape
of smoke and cinders from the fires under the boilers.    It also main-
tained and operated a large "burner" for burning waste material.
On the 22nd of June, 1907, certain large ice-houses and other prop-
erty of the plaintiff's plant were destroyed by fire.

The plaintiff alleged in its declaration "that said burners and
stacks were so negligently located, constructed, maintained, used
and guarded on said twenty-second day of June last, and long prior
thereto, that on said day hot cinders, sparks and flame, negligently
permitted by said defendant to escape therefrom, set fire to the
shipping-runs and houses of the plaintiff and caused a total destruc-
tion thereof" etc.

It is apparent that the plaintiff at the trial practically abandoned
its claim that the fire was caused by sparks from the "burner,"
presumably because of its location and the evidence as to the direc-
tion of the wind at the time of the fire.    The jury found specially,
in answer to questions submitted to them by the presiding Justice,
that the fire was caused by sparks or cinders from the defendant's
smoke-stack, and that the defendant was negligent in the construc-
tion, maintenance or operation of the stack connected with its
boilers.

The fire started in or upon the "shipping-run" so called.    This
was a long, narrow, low structure with shingled gable roof, lapped-
boarded sides, and extended from the outer shipping pier nearly to
the ice houses, and through which the ice passed from the houses
to the vessels.    The run was open at each end and people were
accustomed to pass and repass through it going to and fro from the
river to the town way and to the little railway waiting room situ-
ated not far distant from the south west corner of the ice-houses.    It
is 215 feet from the base of the stack to the point in or upon the

run where the fire started. The stack is 80 feet high. The follow-
ing sketch shows the relative situations of the plants and the loca-
tion of the defendant's smoke-stack in relation to the shipping-run
and the other property of defendant.

Whether the fire started inside or outside of the run was an issue
sharply contested at the trial. No one saw sparks in the air or upon
the roof. The testimony of the witnesses, on the one side and the
other, who were early at the fire, was conflicting upon this issue.
If the fire started inside of the run, then, manifestly, no sparks or
cinders from the smoke-stack caused it; on the other hand if the
fire started on the roof of the run, the jury might properly have
found that it was caused by sparks or cinders from the stack. The
special finding of the jury shows that such was their conclusion.

In the brief of the learned counsel for the defendant it is said:
"The defendant will not contend in this court that the finding that
the fire was caused by sparks from the stack was so clearly and mani-
festly wrong as to authorize the Law Court to set it aside. . . .
It rests so largely upon questions of credibility that, for the purposes
of this hearing, it must be allowed to stand." But it is confidently

contended in behalf of the defendant that the finding of the jury that it was negligent in the construction, maintenance or operation of its smoke-stack connected with its boilers is so manifestly against the weight of the evidence as to require this court to order a new trial.

The principles of law applicable to the question of the defendant's negligence are not in controversy. They are too well settled to require the citation of authorities. The mere fact that the fire was caused by a spark or cinder from the defendant's stack is not alone sufficient to establish its liability. The defendant was not an insurer of the plaintiff's property. Its duty was to exercise ordinary care in the construction, maintenance and operation of its plant to prevent injury to the plaintiff's property. And the question now presented is whether the evidence justifies the finding that it did not exercise ordinary care in the construction, maintenance and operation of its smoke-stack. Ordinary care has been so frequently, recently, and explicitly defined by this court that no misapprehension can exist as to its meaning. It is "such care as reasonable and prudent men use under like circumstances," *Caven* v. *Granite Co.*, 99 Maine, 278; "such care as persons of ordinary prudence would have exercised under like circumstances," *Sawyer* v. *Shoe Co.*, 90 Maine, 369; "such care as an ordinarily reasonable and prudent person exercises with respect to his own affairs under like circumstances," *Raymond* v. *Railroad Co.*, 100 Maine, 529. In the case at bar ordinary care was defined to the jury as "such care as the ordinarily prudent man, mindful of himself and of the rights of others, would have exercised under the same conditions and circumstances," a definition fully in accord with the decisions of this court.

The plaintiff contended at the trial, and still contends, that the defendant failed to exercise ordinary care in respect to its smoke-stack in two particulars, first, that the stack was not high enough; and, second, that it was not provided with a spark arrester on its top.

Fundamental to both of these propositions set up by the plaintiff is the inquiry as to the kind and character of the system used of

which the smoke-stack was a part.   That system and its working was thus described by Mr. A. R. Artz, an insurance inspector of 19 years' experience in examining and inspecting steam lumber mills for insurance companies and rating the risks:     "The front of the boiler has what is called a dutch oven that is really an extension of the grates of the boiler so as to give a larger burning space.   On to this the sawdust drops through holes in the top—slabs are put in the doors in front.   Here the refuse is burned.   Back of this, under the boiler proper is what is called a combustion chamber; here the gases which are roasted out of the fuel are burned.   About a third back from the front they have an arch across, which is an obstruction to this, the object of that is to confine the flames and heat underneath the box so it don't escape too rapidly.   This also acts to make the fuel burn more completely.   After it passes this arch it goes under the rest of the boiler, then up somewhere about four feet and then it passes back through the tubes of the boiler around which is the water of the boiler to make the steam.   Coming to the front of the boiler it goes up the uptake into the smoke flue or breech.   Now, this uptake is about 787 square inches, cross section, but the flue is 2200 in size, cross section; the result is that when the smoke enters that large chamber the velocity is checked just like steam out in the open air—it is checked and slows down and that produces an eddy in the stream of smoke which has a tendency to make the sparks settle and burn.   Here it is somewhat different from the flues in the boiler.   The stack, instead of going up directly in front of the boiler is placed on a base outside so the horizontal flue goes into that base and then up the stack, but this base is hollow and a cross section is almost twice as large as the flue which enters into it,—to be exact it is practically three-quarters in excess.   When the smoke enters this chamber, the chamber being larger, the velocity is checked and it slows down—sparks or anything burning that goes in there, the velocity being checked they slow down, and being heavier than the air or smoke they drop a little, and the result is that they get out of the direct current of the smoke and drop to the bottom of this chamber and burn up and don't go up the stack at all."

It was not contended that the boilers and smoke-stack were not of an approved and standard pattern. They were installed in 1890 by the Bradstreet Lumber Co., of which company the defendant bought the property in 1895, and accordingly had been in use for 17 years.

The burden was on the plaintiff to establish by a fair preponderance of the evidence, that the defendant in maintaining and using that smoke-stack, at its height of 80 feet and without a spark arrester, was negligent,—in other words, that an ordinarily prudent man under the same circumstances and conditions would not have so maintained and used it. We cannot here analyze in detail all the evidence which the plaintiff claims tends to sustain that burden, but it may be thus grouped and summarized: The information which the jury acquired from a view of the premises as they were at the time of the trial; the fact that the fire was caused by a spark from the stack as found by the jury; the opinion of Mr. Toppan, called by the plaintiff as an expert; the falling of cinders and burned out sparks all about the property which came from the stack; and certain acts and conduct of the defendant, and other facts and circumstances, tending to show its knowledge and appreciation of a danger that sparks from its stack might cause fire to plaintiff's property.

Information as to the relative situations of the properties, and of the size, height and location of the stack may have been quickly and readily acquired by the jury from a view of the premises, but we do not think the information so acquired can be more accurate and trustworthy than that, relating to the same facts, which can be acquired from the plans and surveys and the testimony in explanation thereof as disclosed in the record. There is no dispute as to the relative situations of the properties, or as to any of the measurements and distances disclosed in the record.

The fact that the fire was caused by a spark from the stack is a circumstance to be considered on the question of the defendant's negligence, but it really has but little probative force on that issue, which should be determined, and can only be rightly determined, with reference to the danger that was actually created by the operation of the stack prior to the fire, and the knowledge which the defendant had or by the exercise of reasonable care would have had of that danger.

Mr. Toppan, whose business is steam engineering, and who had examined the defendant's plant the day before he testified, gave his opinion that the stack was not high enough, and that it should have been provided with a spark arrester. He did not support his opinion by any comparison of the height of this stack with those used commonly at similar mills with like surroundings, nor did he state that spark arresters are commonly and usually used on smoke-stacks at steam mills similarly situated. He admitted that this stack more than satisfies the scientific rule by which the size or area of the stack is determined with relation to the area of all the boiler tubes and flues, but he claimed that the rule was not applicable to the question whether a smoke-stack is so constructed that it will not emit live sparks. In this particular he differs materially from Mr. Artz, the insurance inspector, called by the defendant as an expert. The latter claims that the rule, which is well recognized among boiler makers, commissioners of boilers, and insurance men, is the test by which it can be determined if a smoke-stack will "spark ;" that experience has shown that the modern steam plant, constructed according to the well recognized rule as to the size and area of the stack compared with the areas of all the other tubes and flues, does not emit live or burning sparks from its smoke-stack.

Mr. Artz testified that he had inspected the defendant's plant since 1896, "not a year and a half apart at any time," and that the construction of the plant was in accordance with, and well within, the recognized rule for the construction of such steam plants. His opinion, as to the sufficiency of the height of the stack, and the need of a spark arrester, is shown by the following excerpt from his testimony ; "Q. From what you have observed and studied, would you expect that live sparks would be emitted from the top of the stack ? A. Not at all. Q. Your duty in inspecting this plant from time to time from 1896 down was to recommend and require such construction there as would reduce the dangers of fire, was it not ? A. Yes, sir. Q. Whether in your judgment as an insurance proposition there, and applying my question wholly to the property of the South Gardiner Lumber Co., any spark arrester was needed ? A. Not at all." He also testified that the want of a

spark arrester was never included as an element of risk in fixing the insurance rate and that "We have never charged them one cent for danger from sparks." The fact that this witness had special experience in inspecting steam mills with reference to the danger and risk from fire, and had for so many years prior to this fire inspected and observed the defendant's plant, and his detailed explanation of its construction and operation, adds force and weight, we think, to his opinion.

But of more importance, we think, than all else as bearing on the issue whether this defendant was negligent in using that smoke-stack, is the history of the use of it for 17 years, and the knowledge the defendant had, or ought to have had, of its capacity in operation to emit sparks capable of setting fire or otherwise.

From a careful and painstaking examination of the evidence contained in the voluminous record in this case we are unable to find any proof that, during the 17 years this stack was used prior to the fire involved in this case, a fire large or small was set from a spark or cinder that came from this stack. This is not a mere absence of evidence as to that point; the witnesses were inquired of in reference to it, and no witness testified that he ever saw or knew of a fire that was set from a spark or cinder that came from this stack. Charles W. Coss, called by the plaintiff, testified that he was superintendent of the ice plant from 1894 to 1897, and that while he was there a fire caught on the roof of the ice house and was put out. He was unable to state on what part of the roof the fire caught, or when it was, or even that the mill was in operation at the time. That testimony certainly does not show that a spark from this stack caused that fire. To appreciate fully the weight that should be given to this fact that during the constant use of this stack through all of that period no fire is known to have been communicated by a spark from it, it must be borne in mind that all about the stack and in the mill yard there was material of a highly inflammable character — chips, sawdust, shavings, and lumber dried and drying. It is also abundantly proved that during all this time cinders, charred sawdust and shavings, fell all over the property, upon the chips, the shavings, the lumber, the roofs of the buildings, and upon the

canvas and rigging of the vessels at the piers, and yet no fire had been known to start from a spark that came from the stack.

James W. Parker, the largest stockholder and president of the defendant company, testified that he had been connected with the company since May 1, 1896, and that during the first four or five years he spent the greater part of his time at the mill when it was running, and since then, and until the last season, he had visited the mill as often as once a week ; that he knew of the inspections of the plant made by Mr. Artz, and that the property was also inspected for other insurance companies ; that he had made a personal study of the property with reference to the risks of fires, and had observed the smoke-stack when the mill was operating, both by day and by night, and that he never saw a live spark come from the top of the stack, and never knew or heard of a fire being started by a spark from the stack. Mr. Longfellow, treasurer of defendant company, who had been connected with the plant since 1877, testified that he never had any knowledge, either from personal observation or from reports made to him, that a fire had ever started from a spark from the stack.

What more could a man have to justify him in believing that this smoke-stack was suitable and safe to use, so far as any risk that sparks would come from it and cause fires to adjoining property is concerned, than the fact that it had been in constant use for 17 years and no fire had ever started from it? Would an ordinarily prudent man require any other test of its safety? In *Lafflin* v. *B. & S. R. R. Co.*, 106 N. Y., page 141, it is well said : "No structure is ever so made that it may not be made safer. But as a general rule, when an appliance or machine, or structure, not obviously dangerous, has been in daily use for years, and has uniformly proved adequate, safe and convenient, its use may be continued without the imputation of culpable imprudence or carelessness."

To hold that the defendant in the use of its smoke-stack, with knowledge that for 17 years it had been in constant use and no fire had been known to originate from sparks coming from it, was negligent — did what the ordinarily prudent person under the same cir-

cumstances would not have done — requires stronger evidence, we think, than the opinion of an expert that the stack should have been higher and had a spark arrester on its top.

But the plaintiff claims that there is evidence in the case which shows that the defendant knew and appreciated that there was a danger of fire from the stack, notwithstanding the history of its use with immunity from fire.

Mr. Ballard, general manager of the plaintiff company, testified that in 1894 he had a conversation with Mr. Parker, the defendant's president, in which he told Mr. Parker that he had great fears that his company would burn the ice-houses down and that "I wished that he would put a spark arrester on the smoke-stack." With reference to whether Mr. Parker made any reply to that he said : "Not any ; he talked about renting the property, the shore." Mr. Parker denies that anything was said in the conversation as to a spark arrester on the stack.

May 22, 1905 Mr. Longfellow wrote Mr. Ballard as follows :

"Dear Sir : — We very kindly call your attention to the Great Falls property here at So. Gardiner, joining our lot. You are aware that we are running our refuse burner, consequently there is great danger from the sparks coming from it catching on the roofs. We have had our mill roof afire two or three times, and the small rigging shed on our premises caught twice in one day, the shingles being old and dry. Now is not there the same danger with the roof of the ice building ? We are covering all of our roofs with rubberoid at quite an expense. We would suggest that you look into the matter in the very near future, and ascertain if anything can be done to make the danger less."

To this letter Mr. Ballard replied declining to act according to the suggestion, and stating in substance that the defendant was required to so use its property as not to endanger the plaintiff's from fire, and that the plaintiff would hold the defendant responsible for any damage that might occur from such cause. To this Mr. Longfellow replied : "We were a little surprised at your reply to our letter relative to fire risk at the mill. We thought you understood the conditions, or we should have been more explicit. There

is no more danger of fire being set by our burner than by our smoke-stack, or by the chimney of the pulp mill.   It is all with the covering of the surrounding buildings.   Our mill buildings have cedar shingles, and have not been reshingled for some time.   The shingles are curled, and become somewhat decayed, which creates the risk.   We have been removing them, placing on iron on the main mill, and rubberoid on the other buildings.   We very kindly called your attention to this, thinking it possible that you would want to look after the shingles on the roof of the ice buildings. We were hardly prepared for such a letter.   It is certainly a poor return for a neighborly kindness.   We have a great deal more property here than the American Ice Co., and are making every effort to protect it, and in protecting it, we have been to considerable expense in furnishing hose, very much more than would be required if it was not for your ice building.   .   .   .   We would be very much pleased if you would come here and look the situation over.   We think you would be convinced that we were not maintaining a fire trap at the expense of our neighbors.   Our refuse burner has been in use for twenty-five years, is now in as good condition as when first built, and there is no more danger of fire from it."

The plaintiff argues that these letters written by Mr. Longfellow in 1905 show that he at that time was of opinion that there was danger of fire from the smoke-stack.   We do not understand what the writer of the letter meant by the words used   "There is no more danger of fire being set by our burner than by our smoke-stack, or by the chimney of the pulp mill."   It is not the statement of a truth, for there is no controversy but that the burner did emit sparks that caused fires about it, and upon the roofs of the mill and buildings, and it appears from the evidence, as we have noted above, that no one had ever known of a fire being set from a spark from the smoke-stack.   The pulp mill was situated further south on the river.   If it was the opinion of Mr. Longfellow when he wrote that letter, that there was as much danger of fire from the smoke-stack as from the burner, that opinion could not have been founded in fact, for it is plainly contrary to the fact; and we do not think the

expression of such an opinion, if it can be so considered, in the letter should have much probative weight upon the question of whether it was negligence for the defendant to use the smoke-stack which 17 years of use had shown to be safe and suitable, and from which during all that use no spark had been emitted that caused a fire so far as was known.

After a painstaking consideration of all the evidence in this case the court is constrained to hold that the finding of the jury that the defendant was not in the exercise of ordinary care in the maintenance and use of its smoke-stack is so manifestly contrary to the weight of the evidence that a new trial must be granted.

*Motion sustained.*